**NOT FOR PUBLICATION**

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY
# CAMDEN VICINAGE

| | |
|---|---|
| CHRISTINA M. GWIAZDOWSKI, | HONORABLE KAREN M. WILLIAMS |
| *Plaintiff,* | Civil Action<br>No. 22-4303 (KMW-MJS) |
| v. | |
| ANTHONY R. MARUCA, MICHAEL W. GALLAGHER, BRENT P. HIGGINS, ROBERT WHARTON, JAMES MCGOWAN, PATRICK J. CALLAHAN, and JOHN DOE NOS. 1-10 (Fictious Names), | **OPINION** |
| *Defendants.* | |

APPEARANCES:

**RICHARD M. WIENER, ESQ.**
ONE GREENTREE CENTRE
SUITE 201
10000 LINCOLN DRIVE EAST
MARLTON, NJ 08053

    *Attorney for Plaintiff*

**DANIEL S. SHEHATA, ESQ.**
**MARVIN L. FREEMAN, ESQ.**
**STEPHEN WILLIAM BONDI, ESQ.**
NEW JERSEY ATTORNEY GENERAL'S OFFICE
25 MARKET ST
TRENTON, NJ 08625

    *Attorneys for Defendants*

**WILLIAMS, District Judge:**

## I. INTRODUCTION

This matter comes before the Court on the motion for summary judgment (ECF No. 50) by Defendants Anthony R. Maruca ("Maruca"), Michael W. Gallagher ("Gallagher"), Brent P. Higgins ("Higgins"), and Robert Wharton ("Wharton"), which Plaintiff Christina M. Gwiazdowski ("Plaintiff") opposes (ECF No. 55). For the reasons set forth below, the motion is **GRANTED in part** and **DENIED in part**.

## II. FACTUAL BACKGROUND[1]

### a. Plaintiff's Arrest

On June 30, 2020, at approximately 10:54 a.m., Donna Tweed called the Port Norris State Police Station to report that Plaintiff, her live-in roommate, struck her in the face during a domestic dispute at their residence. (Statement of Material Facts ("SUMF") ¶ 1.) New Jersey State Police ("NJSP") Officers Maruca and Gallagher were dispatched and arrived at the home shortly after 11:00 a.m. (Plaintiff's Responsive Statement of Material Facts ("RSOMF") ¶¶ 2, 6.) Maruca was greeted at the front door by Tweed, who had a visible laceration on her left cheek. (*Id.* ¶ 2.) Tweed told Maruca that Plaintiff struck her in the face and that she wanted Plaintiff to leave her home. (SUMF ¶ 3.) Maruca entered the residence, where he encountered Plaintiff in the bedroom speaking on a cellphone with her father. (*Id.* ¶ 4.) Maruca instructed Plaintiff to come out of the bedroom, which she did. (*Id.* ¶ 7.) Maruca told Plaintiff to put down her cellphone and put her hands behind her back. (*Id.*) Plaintiff followed Maruca's instruction, and he proceeded to handcuff her. (*Id.*) Gallagher observed Maruca handcuff Plaintiff, though Plaintiff disputes the extent to

---

[1] Maruca, Gallagher, and Higgin's body-worn cameras and Maruca's patrol vehicle's digital in-vehicle recording ("DIVR") system were active and recorded the officers' interactions with Plaintiff during her arrest and transport to the Port Norris State Police Station. (*See* Freeman Decl., Exs. D, E, F, G, ECF No. 50-2.)

2

which Gallagher could view Plaintiff's wrists during the handcuffing or the way the handcuffs were applied. (*Id.* ¶ 8; RSOMF ¶ 8.)

Maruca arrested Plaintiff on the charge of simple assault. (RSOMF ¶¶ 20, 30.) After handcuffing Plaintiff, Maruca stated he was going to double-lock the handcuffs "so they don't get tighter." (*Id.* ¶¶ 11-12.) For approximately 30 seconds, Maruca appeared to struggle as he apparently tried to double-lock the handcuffs. (*Id.* ¶ 11.) Maruca testified during his deposition that he checked the tightness of the handcuffs consistent with his training by placing two fingers between the handcuffs and Plaintiff's wrists to ensure they were properly fitted but acknowledged it was possible that he did not properly double-lock the handcuffs.[2] (SSOMF ¶ 46.) While being arrested, Plaintiff did not complain about the handcuffs being too tight or mention that she had recently undergone carpal tunnel surgery. (SUMF ¶ 13.) Plaintiff told Maruca about issues she was having with Tweed and described her account of what had occurred that morning. (*Id.*)

After speaking with Plaintiff, Maruca left her in Gallagher's custody and exited the residence to speak with NJSP Officer Higgins. (*Id.* ¶ 14.) Higgins, who had interviewed Tweed while Maruca was in the residence, relayed that Tweed claimed Plaintiff struck her during an argument. (*Id.* ¶ 14.) Conversely, Plaintiff told Maruca that Tweed was injured when Plaintiff threw clothes at her, which caused Tweed to fall from her chair and strike her cheek on an adjacent table. (*Id.* ¶ 15.) Maruca then escorted Plaintiff out of the house and searched her beside his patrol vehicle. (*Id.* ¶ 18.) Upon being seated in the backseat of the patrol car at approximately 11:08 a.m., Plaintiff first complained of the tightness of the handcuffs, stating: "Can you do me a favor? These are really, really tight." (RSOMF ¶ 10.) Plaintiff also motioned to the handcuffs while grimacing.

---

[2] "Double-locking" is done after application of the handcuffs and is accomplished by using the double-lock pin on the handcuff key to prevent the handcuffs from further tightening. (*See* MSJ Br. at n.1 (citing SUMF, Ex. Q).)

3

(*Id.*) Maruca responded to Plaintiff's complaint of handcuff-related pain by stating, "Yeah, we'll get it sorted out at the station. It's not far." (*Id.*)

Plaintiff then asked Maruca for access to her cellphone so she could call her father. (SUMF ¶ 23.) Gallagher took Plaintiff's cellphone and assisted Plaintiff in calling her father, who Plaintiff asked to pick her up at the Port Norris State Police Station. (*Id.*) While doing so, Gallagher asked Plaintiff if her seatbelt was too tight. (*Id.* ¶ 25.) Plaintiff responded, "it's the cuffs," though Gallagher did not hear her because he was speaking to Plaintiff's father. (*Id.*) After Gallagher provided driving directions to Plaintiff's father, he again asked Plaintiff if her seatbelt was too tight, and Plaintiff stated: "it is the handcuffs, they are too tight." (*Id.* ¶ 26.) Gallagher responded that "they are as loose as they could be, I know they don't feel that way, but they are." (*Id.*)

Maruca questioned Plaintiff about crack pipes that were discovered in the house, which Tweed claimed belonged to Plaintiff. (*Id.* ¶ 27.) Plaintiff denied that the pipes were hers and claimed they belonged to a friend who recently visited. (*Id.* ¶ 24.) Plaintiff then stated to Maruca: "I just want to get out of here because my hands are like really hurting me." (RSOMF ¶ 10.) Maruca responded by saying, "Okay," and shutting the car door. (*Id.*) Up until that point, Plaintiff had not mentioned having recently undergone carpal tunnel surgery. (SUMF ¶ 27.) As Maruca prepared to drive Plaintiff to the police station, he asked Plaintiff, "You all right?" (RSOMF ¶ 28.) Plaintiff responded by stating "No. It's bad . . . I just had surgery on my hands." (*Id.*) Maruca replied by stating, "Ok. They're not comfortable." (*Id.*) Maruca then began the approximately 10-minute drive to the police station, which was recorded on the DIVR system that included an interior camera fixed on Plaintiff. (*Id.*) Plaintiff was seated on the rear passenger side of the vehicle, diagonally from Maruca. (*Id.*)

4

Maruca testified that he typically wants to be able to observe the prisoner he is transporting to reduce flight risk and ensure they are okay. (*Id.* ¶ 49.) He also testified that he did not recall anything preventing him from seeing Plaintiff during the drive to the police station. (*Id.* ¶ 50.) Maruca arrived at the station at approximately 11:46 a.m. and removed Plaintiff's handcuffs, approximately 30 minutes from the time Plaintiff first complained they were too tight. (*Id.*) After being processed at the police station, Maruca drove Plaintiff back to the residence to oversee Plaintiff's removal of her personal belongings and prevent any further confrontations with Tweed. (SUMF ¶ 32.) Maruca's video depicts Plaintiff lifting and carrying bags, a large box, and a case of water. (*Id.* ¶¶ 33-35.)

On November 2, 2020, the municipal court dismissed the criminal charge of simple assault against Plaintiff. (SUMF, Ex. S.)

### b. NJSP Investigation

In July 2022, Plaintiff filed an internal affairs complaint with the NJSP Office of Law Enforcement Professional Standards against Maruca and Gallagher, alleging improper handcuffing in connection with her arrest. (SSDMF ¶ 54, Ex. A; Freeman Decl., Ex. M, ECF No. 50-2.) Following a 16-month investigation, the NJSP concluded that Maurca and Gallagher violated NJSP Standard Operating Procedure ("SOP") F4, which requires officers to timely respond to complaints of handcuffs being too tight, absent exigent circumstances, by physically assessing the tightness of the handcuffs. (SSDMF ¶ 54.)

### c. Procedural History

On June 28, 2022, Plaintiff filed a six-Count Complaint against Defendants. (ECF No. 1.) Plaintiff's claims include: (1) a Fourth Amendment unreasonable seizure claim pursuant to 42 U.S.C. § 1983 against Maruca for alleged deprivation of Plaintiff's right to be free from

unreasonable and excessive force (Count I); (2) § 1983 claims against Gallagher, Higgins, and Wharton for acquiescing and failing to intervene to loosen, adjust, or remove the handcuffs (Counts II-IV); and (3) § 1983 claims against McGowan and Callahan for the alleged failure to properly train, supervise, or discipline (Counts V-VI). (*Id.* ¶ 39-62.) On November 14, 2022, McGowan and Callahan filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), which was rendered moot by Plaintiff's voluntary dismissal of those two Defendants. (ECF Nos. 13, 15.) As a result, only Defendants Maruca, Gallagher, Higgins, and Wharton filed an answer. (ECF No. 20.)

On February 14, 2023, the Court entered a Scheduling Order directing the parties to file dispositive motions by March 4, 2024. (ECF No. 24.) That deadline was extended multiple times, to October 28, 2024. (*See* ECF Nos. 34, 37, 40, 46, 49.) Following a conference on October 4, 2024, the Court entered a Text Order stating: "[I]n the event that this matter is not resolved via motion, plaintiff's expert disclosures and reports shall be served 30 days after the decision on the summary judgment motion and defendant's expert disclosures and reports will be due 30 days thereafter." (ECF No. 49.)

### d. The Instant Motion

On October 28, 2024, Defendants filed the instant Motion for Summary Judgment. (ECF No. 50.) In her Opposition dated December 23, 2024, Plaintiff attached as an exhibit the Expert Disclosures of her treating hand surgeon, Dr. Patrick Kane, which details Plaintiff's medical treatment following her arrest. (Declaration of Richard Weiner ("Weiner Decl.") Ex. B, ECF No. 55-2.) Plaintiff also included a Supplemental Statement of Disputed Material Facts ("SSDMF") pursuant to L.Civ.R. 56.1, which rely in part on the foregoing disclosures. (ECF No. 55-1.) Therein, Plaintiff states that she sought treatment from Dr. Kane for alleged injuries to her hand resulting from the arrest, which Defendants do not dispute. (*See id.* ¶ 56; Reply to SSDMF ¶ 56.)

### III. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' under Rule 56 if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) ("A fact is material if—taken as true—it would affect the outcome of the case under governing law."). Moreover, "[a] dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Santini*, 795 F.3d at 416 (quoting *Anderson*, 477 U.S. at 248).

The moving party bears the burden of identifying portions of the record that establish the absence of a genuine issue of material fact. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The burden then "shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations omitted)). To survive a motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *Anderson*, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992) (quoting *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991)). When considering a motion for summary judgment, the court views the facts and all reasonable inferences drawn from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. The threshold inquiry is whether there are "any genuine factual

issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Quincy Mut. Fire Ins. Co. v. Scripto USA*, 573 F. Supp. 2d 875, 878 (D.N.J. 2008) (quoting *Liberty Lobby*, 477 U.S. at 250).

## IV. DISCUSSION

Plaintiff's Complaint alleges that Defendants violated her constitutional rights pursuant to 42 U.S.C. § 1983. The gravamen of the Complaint asserts claims against Maruca for the use of excessive force (Compl. ¶¶ 39-42), and against Gallagher, Higgins, and Wharton for failure to intervene (*id.* ¶¶ 43-54).[3]

> Section 1983 of Title 42 subjects to liability:
>
> > Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws. 42 U.S.C. § 1983.

Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)). "The first step in any [§ 1983] claim is to identify the specific constitutional right allegedly infringed." *Albright*, 510 U.S. at 271 (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989), and *Baker*, 443 U.S. at 140). To establish a viable § 1983 claim, a plaintiff must demonstrate that "the conduct complained of was committed by a person acting under color of state law" and that the "conduct deprived the plaintiff of his rights, privileges and immunities secured by the Constitution or laws of the United States." *Kost v.*

---

[3] Plaintiffs' Complaint also asserted claims for failure to supervise and train against Defendants McGowan and Callahan, (Compl. ¶¶ 55-62), which Plaintiff subsequently dismissed without prejudice. (ECF No. 15.)

8

*Kozakiewicz*, 1 F.3d 176, 184 (3d Cir.1993) (quoting *Parratt v. Taylor*, 451 U.S. 527, 535 (1981) *overruled in part on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986)).

In a suit against a police officer for violations of constitutional rights, the requisites of qualified immunity must be considered. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The qualified immunity standard 'gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.'" *Gilles v. Davis*, 427 F.3d 197, 203 (3d Cir. 2005) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)).

To determine whether qualified immunity acts as a defense here, this Court must determine whether: (1) the officer's conduct violated a constitutional right, and, if so, (2) whether the constitutional right was clearly established. *Saucier*, 533 U.S. at 201. A court is permitted to exercise its discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand. *Pearson*, 555 U.S. at 236. This inquiry turns on the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Id.* at 244 (internal quotation and citation omitted).

### a. Excessive Force Claim Against Maruca

The Fourth Amendment guarantees citizens the right "to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV; *see also Groman v. Twp. of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995) ("An excessive force claim under § 1983 arising out of law

enforcement conduct is based on the Fourth Amendment's protection from unreasonable seizures of the person."). "[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989).

"The test of reasonableness under the Fourth Amendment is whether under the totality of the circumstances, 'the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations.'" *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004) (quoting *Graham*, 490 U.S. at 397). A court conducting a reasonableness assessment should consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he actively is resisting arrest or attempting to evade arrest by flight." *Id.* at 776-77. A court may also consider "the possibility that the persons subject to the police action are violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." *Id.*

"[R]easonableness under the Fourth Amendment should frequently remain a question for the jury," however, "defendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." *Kopec*, 361 F.3d at 777 (quoting *Abraham v. Raso*, 183 F.3d 279, 290 (3d Cir. 1999)).

Defendants acknowledge that in the context of "excessive force claims that stem from the placement of handcuffs, the Third Circuit has held that a plaintiff who suffers serious injury as a

10

result of 'excessively tight' handcuffs when officers ignore complaints that the handcuffs are causing significant pain may establish that the officer's 'use of force was excessive in violation of the Fourth Amendment.'" (MSJ Br. at 13 (quoting *Kopec*, 361 F.3d at 777).) Courts in the Third Circuit analyzing excessively tight handcuffs claims consider the intensity of the plaintiff's pain, the officer's awareness of the plaintiff's pain, whether the plaintiff asked to have the handcuffs removed or loosened and how long after those requests the handcuffs were removed, whether any circumstances justified a delay in removing the handcuffs, and the severity of the plaintiff's injury. *See Kopec*, 361 F.3d at 777-78; *Gilles*, 427 F.3d at 207-08.

In *Kopec*, the Third Circuit reversed summary judgment in favor of a police officer on an excessive force claim arising from excessively tight handcuffing. *Kopec*, 361 F.3d at 773-74. The plaintiff in that case was stopped for trespassing and when he refused to provide his name, address or phone number, the officer arrested the plaintiff for disorderly conduct and handcuffed the plaintiff behind his back. *Id.* Within about ten seconds, the plaintiff claimed he lost feeling in his right hand and asked the officer to loosen the handcuffs. *Id.* The plaintiff told the officer the pain was unbearable and begged him to loosen the handcuffs, before falling to the ground groaning in excruciating pain. *Id.* After about ten minutes, the officer finally loosened the handcuffs. *Id.* As a result, the plaintiff claimed to have permanent nerve damage in his wrist. *Id.*

The Third Circuit held that, "the facts [the plaintiff] asserts, taken in the light most favorable to him, show that [the officer] violated [the plaintiff's] Fourth Amendment rights." *Id.* at 776. The court noted that the officer faced "rather benign circumstances that hardly justified his failure to respond more promptly" to the plaintiff's entreaties. *Id.* at 777. The officer "was not, after all, in the midst of a dangerous situation involving a serious crime or armed criminals." *Id.*

11

Regarding qualified immunity, the court held "it cannot be said as a matter of law that a reasonable officer would not have known that this conduct was in violation of the Fourth Amendment." *Id.*

Here, the uncontroverted BWC recordings reveal that Plaintiff complained to Maruca at least three times that her handcuffs were too tight. (RSOMF ¶¶ 10, 41.) Plaintiff first complained that her handcuffs were too tight and were hurting her at approximately 11:18 a.m., when she was first placed in the back seat of Maruca's patrol vehicle. (RSOMF at ¶ 10.) At approximately 11:31 a.m., Plaintiff again complained to Maruca that her hands were "really hurting" her. (*Id.*) Maruca was also standing beside Gallagher minutes earlier, when Plaintiff complained to him that the handcuffs were too tight. (*Id.*) Minutes later, Maruca asked Plaintiff if she was "all right," to which Plaintiff responded by stating, "No. It's bad . . . I just had surgery on my hands." (*Id.*) Maruca did not loosen the handcuffs or even check to ensure they were not too tight at any time before arriving at the precinct, about 30 minutes after Plaintiff was handcuffed. (RSOMF ¶ 41; SSDMF ¶ 42.)

Moreover, like the officer in *Kopec*, Maruca "faced rather benign circumstances that hardly justified his failure to respond more promptly to [the plaintiff's] entreaties." *See Kopec*, 361 F.3d at 777. Plaintiff was accused of a simple assault during a domestic dispute—she was the sole person with whom the four State Troopers at the scene were contending. (RSOMF ¶ 20; *see* SUMF ¶ 30 (citing Exs. G and J).) As in *Kopec*, Plaintiff was unarmed, and Maruca was not "in the midst of a dangerous situation involving a serious crime or armed criminals." *Kopec*, 361 F.3d at 777.

Furthermore, it is undisputed that the day after the incident, Plaintiff sought treatment for injuries to her wrists. (SSDMF ¶ 56.) Although some of Plaintiff's injuries may be attributable to conditions predating her arrest, there is evidence in the record that could support a finding that

12

Plaintiff's injuries were "solely traceable to being handcuffed." *Gattas v. City of Jersey City*, No. 07-4242, 2009 WL 5216973, at *9 (D.N.J. Dec. 29, 2009); *see* (SSDMF ¶¶ 57-68.)[4]

The facts Plaintiff suggests, taken in the light most favorable to her, demonstrate genuine issues of material fact regarding, at a minimum: (1) whether the handcuffs were excessively tight upon their initial application; (2) whether the handcuffs were double-locked to prevent them from becoming excessively tight thereafter and whether they indeed became tighter; (3) whether Plaintiff demonstrated sufficient visible signs of pain to require Maruca to check the tightness of her handcuffs; and (4) the extent to which Plaintiff suffered injuries caused by the tightness of her handcuffs. Regarding qualified immunity, Defendants acknowledge that the Third Circuit established in *Kopec* that an arresting officer's use of force may be excessive where he ignores complaints that handcuffs are causing significant pain, and a plaintiff suffers serious injury as a result. (MSJ Br. at 13.) Accordingly, resolving all factual inferences in Plaintiff's favor, "it cannot be said as a matter of law that a reasonable officer would not have known that this conduct was in violation of the Fourth Amendment." *Kopec*, 361 F.3d at 777.

Notably, there is no dispute that Maruca violated NJSP SOP F4 when he failed to physically assess the tightness of Plaintiff's handcuffs in response to her complaints. (SSDMF ¶¶ 51, 55; Reply to SSDMF ¶¶ 51, 55, ECF No. 58-1.) Maruca also acknowledged in his deposition that he was trained regarding SOP F4 and testified that no exigent circumstances prevented him from checking Plaintiff's handcuffs in response to her complaints. (SSDMF ¶¶ 52-53 (citing Ex. Q, Maruca Dep. 44:24-45:6).) "Violation of a police department procedure . . . does not necessarily

---

[4] Defendants dispute Plaintiff's Supplemental Statement of Disputed Material Facts with respect to ¶¶ 57-68 on the grounds that the Court's October 24, 2024 Text Order stated that expert disclosures and reports shall be served after the Court's decision on this motion for summary judgment. (*See* ECF No. 49, Reply to SSDMF ¶¶ 57-68, ECF No. 58-1.) Defendants do not dispute, however, that Plaintiff sought treatment from her hand surgeon for alleged injuries to her hand resulting from the arrest. (Reply to SSDMF ¶ 56). Nor do Defendants cite to any portion of the record disputing her hand surgeon's medical summary, submitted by Defendants, which notes swelling and reports of pain in Plaintiff's hands and wrists days following her arrest and the resultant need for treatment. (*See* SUMF, Ex. O.)

13

infringe upon a constitutional right giving rise to a Section 1983 claim"; rather, the conduct must "violate a right which is created by Federal statutory law or the United States Constitution." *Green v. City of Paterson*, 971 F. Supp. 891, 903 (D.N.J. 1997); *see also Thomas v. Weiss*, No. 21- 14554, 2024 WL 2830662, at *6 n.3 (D.N.J. June 4, 2024). The Court notes that here, if all factual disputes are resolved in favor of Plaintiff, Maruca's failure to comply with NJSP SOP F4 would not be consistent with the Third Circuit's teachings announced in *Kopec*. *See Kopec*, 361 F.3d at 777.

For these reasons, Maruca's summary judgment motion as to Plaintiff's excessive force claim is denied.

### b. Federal Constitutional Claims Against Gallagher

Defendants argue that summary judgment in favor of Gallagher, Higgins, and Wharton is appropriate with respect to Plaintiff's failure to intervene claims if summary judgment is granted in favor of Maruca on Plaintiff's excessive force claim. (MSJ Br. at 25-26.) While Defendants further argue that summary judgment should be granted as to Higgins and Wharton because they were not aware of Plaintiff's complaints, Defendants do not dispute that Gallagher was aware Plaintiff complained that her handcuffs were too tight. (*Id.*; RSOMF ¶ 10.)

Courts have consistently held that "a police officer has a duty to take reasonable steps to protect a victim from another officer's use of excessive force." *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002). "[A]n officer is only liable if there is a realistic and reasonable opportunity to intervene." *Id.* Here, it is undisputed that Gallagher observed Maruca handcuff Plaintiff. (SUMF ¶ 8.) It is also undisputed that Gallagher asked Plaintiff if her seatbelt was too tight, and Plaintiff complained it was the handcuffs that were too tight. (*Id.* ¶ 25.) Rather than physically check the tightness of the handcuffs in response—as required by SOP F4—Gallagher simply told Plaintiff that "they were as loose as they could be." (*Id.* ¶ 26.) Notably, Gallagher testified that he was

14

trained regarding SOP F4 and that no exigent circumstances prevented him from checking the tightness of the handcuffs. (SSDMF ¶ 52, Ex. R., Gallagher Dep. 26:18-21, 30:11-19.) It is further undisputed that Gallagher's failure to physically assess the tightness of Plaintiff's handcuffs was deemed by the NJSP to have violated SOP F4. (SSDMF ¶ 55.)

Because genuine issues of material fact exist as to whether Maruca's use of force was reasonable, there remain factual questions as to whether Gallagher was required but failed to intervene. *See Smith*, 293 F.3d at 650. Accordingly, Defendants' motion for summary judgment as to Plaintiff's failure to intervene claim against Gallagher is denied.

### c. Claims against Defendants Brent P. Higgins, Robert Wharton, James McGowan, Patrick J. Callahan, and Counts Three, Four, Five, and Six.

In her Opposition brief, Plaintiff "agrees that summary judgment should be granted in favor of Defendants Brent P. Higgins, Robert Wharton, James McGowan, and Patrick Callahan." (Opp. at 29.) Accordingly, the Court will grant summary judgment in favor of these Defendants.

## V. CONCLUSION

For all the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 50) is **GRANTED in part** and **DENIED in part**. An Order consistent with this Opinion shall follow.

Dated: June __, 2025

KAREN M. WILLIAMS
UNITED STATES DISTRICT JUDGE